McCLURE *v.* STATE.

4528                                                     215 S. W. 2d 524

Opinion delivered November 22, 1948.
Rehearing denied January 3, 1949.

160

*Wils Davis, Claude F. Cooper, Horace W. Whitsett* and *J. J. Mardis,* for appellant.

*Guy E. Williams,* Attorney General and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

Wine, J.   The appellant, Dr. G. R. McClure, was indicted by the Grand Jury of Greene county, the charging part of the indictment reading as follows: ''The said Dr. G. R. McClure in Greene County, Arkansas, did on the 7th day of May, 1947, unlawfully, willfully and feloniously, while engaged in the practice of medicine, aid, abet and assist in the commission of an abortion upon one Allene Janes, which abortion was not produced for the purpose of saving the life of the said Allene Janes against the peace and dignity of the State of Arkansas.''

At the trial of the case the jury found the appellant guilty and assessed his punishment at confinement in the State Penitentiary for a period of one year.   Section 1, Act 4 of 1875, § 3286, Pope's Digest, reads as follows: ''It shall be unlawful for any one to administer or prescribe any medicine or drugs to any woman with child, with intent to produce an abortion or premature delivery of any fetus before the period of quickening, or to produce or attempt to produce such abortion by any other means; and any person offending against the provisions of this section shall be fined in any sum not exceeding one thousand dollars, and imprisoned in the penitentiary not less than one nor more than five years. Provided, this section shall not apply to any abortion

produced by any regular practicing physician for the purpose of saving the mother's life.''

Section 25, Initiated Act No. 3 of 1936 (Acts 1937, p. 1384) provides: ''The distinction between principals and accessories before the fact is hereby abolished, and all accessories before the fact shall be deemed principals and punished as such. In any case of felony, when the evidence justifies, one indicted as principal may be convicted as an accessory after the fact; if indicted as accessory after the fact, he may be convicted as principal.''

Encyclopedia Americana defines abortion: ''The expulsion of a fetus from the uterus before it is capable of carrying on its own life.''

Medical Jurisprudence, Forensic Medicine and Toxicology, Witthaus & Becker, Vol. II, in its treatise on criminal abortion states in part: ''According to the law in the United States, any person who does any act calculated to prevent a child being born alive is guilty of abortion.''

In Taylor's Med. Jurisp. 11th Am. Ed., p. 526, Clark Bell, the American editor, refers to a number of American decisions illustrating various interpretations of the law as laid down in different states of the union.

In considering a case of alleged abortion, four main questions suggest themselves:

1. Has abortion taken place?

2. If so, was it *spontaneous* (from natural causes) or *induced*. (By the intentional act of the mother or any other person)?

3. If intentionally induced, was the act justifiable or criminal?

4. Did the induced abortion injure health or destroy life?

It is not disputed that Allene Janes died as a result of an abortion performed upon her.

It was the testimony of Willene Shoultz, sister of the deceased Allene Janes, State's witness, that she,

Willene Shoultz, accompanied her sister Allene Janes to the hospital owned and operated by the appellant in Paragould on May 5, 1947, where Allene Janes talked with the appellant for the purpose of inducing appellant to produce an abortion, she being pregnant with child; that appellant directed her to Dr. Boyd, Blytheville, Arkansas, with further directions that after her visit to Dr. Boyd, she should return directly to appellant's hospital to be cared for by appellant. Allene Janes inquired of appellant what process Dr. Boyd used, that she was afraid of a catheter, and also inquired as to the extent of the pain that she might reasonably expect. Appellant replied ". . . he (appellant) had sent a million over there and hadn't lost a patient yet and he said she would not have any pain while she was in his hospital; that he would give her penicillin shots to keep down inflammation and for her to come directly back and he would put her to bed."

This witness testified she was in the hall directly outside the door of the doctor's (appellant's) office at the time of this conversation. This witness further testified that on the seventh day of May, 1947, Allene Janes, together with her former husband, Donald Janes, his sister, Lavanna Clark, Lavanna Clark's husband, Leon Clark and this witness, drove to Blytheville where Allene Janes paid a visit to the office of Dr. Boyd, who performed an operation for the purpose of producing an abortion and heavily packed her with gauze, that Allene Janes, together with the other parties mentioned, immediately returned to Paragould, a distance of approximately 50 miles, arriving there about 12 or 12:30 noon. Allene Janes went directly to appellant's hospital where she remained about ten minutes before going to her home, returning to the appellant's hospital, to which she walked, about 2:30 or 3:00 p. m. Witness next saw Allene in bed at appellant's hospital about 7:00 p. m., where she "acted naturally." Witness returned to appellant's hospital about 9:00 p. m. to find her sister, Allene, in pain. Appellant was not present when witness returned at 9:00 p. m., but the nurses were giving "shots" to Allene. Witness asked the nurses in attendance to call the doctor, to which one nurse replied they

"wanted everything to move naturally," but Allene's pain became so intense that the doctor was called. Later that night the abortion was completed by the passage of the gauze packing and about a two-month-old fetus. This witness was corroborated as to the trip to Blytheville and return to appellant's hospital by Lavanna Clark and Donald Janes, the admissibility of whose testimony will be further discussed.

State's witness, John Shoultz, testified that he was the father of the deceased Allene Janes, who was 23 years of age at the time of her death; that she had been married to Donald Janes and from that union four children were born and that the deceased, Allene Janes, prior to her death was in good health, medium size, weighing approximately 120 pounds and, according to her size, she was a strong woman.

This witness further testified that upon being notified of his daughter's condition, he went to appellant's hospital about 2:00 a. m., May 8, 1947, for the purpose of moving his daughter from McClure's Hospital to Dixon's Memorial Hospital. Upon his arrival, he found appellant seated by the bedside of Allene Janes; that appellant protested the moving of Allene Janes, but witness was unrelenting. Appellant then insisted that witness sign "some papers," a release, in the following words and figures:

"PARAGOULD HOSPITAL
Dr. G. R. McClure, Chief of Staff
Paragould, Arkansas

May 8, 1947

To whom it may concern: This is to certify that I, John Shoultz, Route No. 5, Paragould, Arkansas, being the father of Allene Janes, am signing this release for her and removing this patient from the Paragould Hospital without the permission and against the advice of Dr. G. R. McClure or Dr. F. A. Poe, and will not hold liable Dr. G. R. McClure, Dr. F. A. Poe, the Paragould Hospital, or its employees for the condition of Allene Janes or the outcome of her removal. (Signed) John Shoultz.

"Witnesses: (Signed) Willene Shoultz, Marguerite Maraman, Ruby Parker."

In addition to this release from John Shoultz, appellant simultaneously with or very soon after admitting Allene Janes to the hospital on the afternoon of May 7, 1947, took from her a release and rendered her a statement in the following words and figures:

"Paragould Hospital
Dr. G. R. McClure, Chief of Staff
Paragould, Arkansas

May 7, 1947

"To whom it may concern: This is to certify that I, Allene Janes, Route No. 5, Paragould Arkansas, will not hold liable the Paragould Hospital, Dr. G. R. McClure, or any employee of Dr. McClure for the outcome of my case. I realize that it is a dangerous case and certify that I was in a serious condition when I entered the Paragould Hospital. I further state that neither Dr. McClure nor any employee of his had anything whatsoever to do with my condition when I entered the Paragould Hospital. (Signed) Allene Janes.

"Witnesses: (Signed) Marguerite Maraman, Ruby Parker, May Pepper."

\* \* \*

"Statement of Account With

Paragould Hospital
Dr. G. R. McClure, Chief of Staff
Paragould, Arkansas

May 7, 1947

"To Allene Janes

| Description | Charges |
| --- | --- |
| Hospitalization and care | $50.00 |
| Total | $50.00 |
| Balance Amt. Due | $50.00" |

It would serve no useful purpose to set out the gory details testified to by witnesses as to the exploratory expedition of appellant into the abdomen of deceased

Allene Janes, but the essential portions and results of such expedition will be further treated of with relation to the testimony of Dr. Poe, who was called in by members of the deceased Allene Janes' family, and who, upon being advised that it was agreeable with appellant, came in as a consultant in the case. Dr. Poe testified that he had formerly been on the staff of Dr. McClure's Clinic; had been there many times as a consultant on different cases; that Dr. McClure is a professional friend of his and that he recalls being called to Dr. McClure's Clinic about midnight on May 7, 1947, where he saw Allene Janes; made no physical or manual examination of her; merely took her pulse and observed her; did not examine her female region or pelvic region; had the matter pointed out that was in some pans reported by the nurses to have passed from her; observed only blood in one pan and in the other blood, fecal matter and a fetus and some afterbirth; and substance that looked like intestinal tissue; did not accept Allene Janes as a patient or consider himself her attending physician; knew nothing of her condition before he was called; gave some directions as to emergency treatment. In witness' opinion, there wasn't any other treatment at the time that could have been used; did not examine the matter shown him that was in the pan as to length or amount; it wasn't very much; the piece of intestine might have been six or eight inches long; had nothing to do with the treatment of Allene Janes and did not ask for the release signed by John Shoultz. The immature fetus and material that he saw in the pans was of the type that is passed or discharged by a female or removed from a female at the time of a miscarriage or abortive process.

Appellant denied that he had seen Allene Janes prior to May 7, 1947, on which date she became a patient at the hospital, representing herself to be an unmarried woman who had undergone an operation for the purpose of an abortion. At this time appellant advised Allene Janes he wanted to help her if he could, but that she would have to give him a statement to protect him because he did not want to get into trouble, and he dic-

tated to his secretary, Miss Pepper, the release taken from Allene Janes, as previously herein copied.

After signing the release, Allene Janes was put to bed and appellant prescribed morphine which was given at 3:45 p. m. He made no examination of her, just put her to bed in care of a nurse. The nurse who kept the chart reported that the patient was flowing and appellant prescribed pituitin. He was later called from his apartment by Miss Maraman, an employee of the hospital, to Allene's bedside, where he found her in a critical condition. Appellant further testified ''he did not know Dr. D. L. Boyd, and does not know him now; had never seen him, and never talked to him on the phone in his life; had no connection whatever with him and did not know where his office was, and did not tell Allene Janes or anyone else that this doctor (Dr. Boyd) had moved his office . . . had nothing to do with the abortion either directly or remotely by suggestion or otherwise.''

The testimony of appellant's employees, Miss Marguerite Maraman and Miss Mae Pepper, neither of whom were graduate nurses, was largely in the same vein as the testimony of the appellant. Three doctors called by defendant testified to the effect that the treatment given by appellant according to his testimony was proper treatment under the circumstances. Three doctors and a graduate nurse were called in rebuttal by the State. The testimony and transcript before us, 491 pages, is too voluminous to review in extended detail.

In reviewing the entire case, we have given consideration to what we consider to be four essential questions:

1. Was the abortion produced and completed by Dr. Boyd or was his work preliminary to something completed by Dr. McClure?

2. Was there substantial evidence other than the testimony given by an accomplice to show that the deceased, Allene Janes, called on Dr. McClure, May 5, 1947, and was thereupon directed to go to Dr. Boyd?

3. Could any one of the State's supporting witnesses be other than an accomplice?

4. Were physical circumstances considered in connection with the admittedly admissible evidence, sufficient to corroborate, even if it should be found that all of the State's witnesses were accomplices?

In both the brief and oral argument appellant emphasized his contention that he was entitled to a directed verdict of not guilty. He predicates this on his assumption that there is no corroboration—that is, there is no testimony in the record other than that of Donald Janes, Willene Shoultz, and Lavanna Clark which tends in any wise to connect the appellant with the commission of the alleged operation and that these three witnesses were accomplices. To this, we do not fully agree, even though the trial court instructed the jury that they could not convict the appellant upon the testimony of Donald Janes, Willine Shoultz, and Lavanna Clark unless the jury found that their testimony was corroborated by other evidence in the case tending to connect the appellant with the commission of the crime.

The generally accepted test as to whether a witness is an accomplice is whether he, himself, could have been indicted for the offense either as a principal or accessory. If he could not, then he is not an accomplice. Am. Jur. Vol. 14, § 110, p. 840. Applying this test, it could hardly be insisted that Willene Shoultz and Lavanna Clark were accomplices. However, for the purpose of this opinion, we are so considering Donald Janes and disregarding his testimony, although this court is not bound by the instruction given by the trial court on this point. Notwithstanding this instruction (more favorable to appellant than the law requires), the jury, as was its province, found that there was sufficient corroboration without the testimony of these three witnesses. It is true that a conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof . . . Section 4017, Pope's Digest.

"The rule in this state is that the corroborating evidence need only tend to connect the defendant with the commission of the offense, and not that such evidence of itself be sufficient, and where there is substantial corroborating evidence tending to connect the defendant with the offense, its sufficiency is a question for the jury, together with that of the accomplice." *Casteel* v. *State,* 205 Ark. 82, 167 S. W. 2d 634, and extensive citations therein set out. See, also, *Jones* v. *State,* 208 Ark. 918, 188 S. W. 2d 131; *Taylor* v. *State,* 209 Ark. 1010, 190 S. W. 2d 440; *Hodge* v. *State,* 211 Ark. 1005, 204 S. W. 2d 374.

Furthermore, even if we should consider it in a light most favorable to appellant the views urged by him (which we are not required to do) it is not shown that either John Shoultz (father of Allene Janes) or Dr. Poe was an accomplice and the jury had the right to consider all the attendant circumstances testified to by these latter two witnesses.

Appellant in his very excellent brief concedes: ". . . the weight to be given corroborative evidence is a question for the jury."

In this connection, the jury, as is this court in reviewing the case on appeal, was confronted with and had a right to consider the corroborating acts of the appellant in his taking of the release from Allene Janes and the rendering of a statement in full for services immediately upon her entry into appellant's hospital, without having examined her. The jury may well have considered, as have we, how appellant could render a statement for the given sum of $50 without yet knowing the extent of the deceased's illness or the probable time she would remain in the hospital or the care required unless he had a previous understanding with her.

Appellant next contends the court should have permitted introduction of evidence to show that no action had been taken against Dr. Boyd either by the family of the deceased or by the State of Arkansas. While speculation might suggest an answer, we are not permitted to so indulge. Even if it be true that no action has been taken that fact would not mitigate the offense of the appellant.

This being a felony case, we have reviewed all of the assignments of error set forth in appellant's motion for a new trial and found them to be without merit.

This court, in the case of *Davis* v. *State*, 96 Ark. 7, 130 S. W. 547, used this language: "an abortion is the delivery or expulsion of the human fetus prematurely."

Thus, it may be said that the type of abortion which we are here considering involves two steps: (a) the curettement and (b) the expulsion or delivery; and it is not even suggested in the instant case that the expulsion or delivery of the fetus occurred prior to the time the patient was in appellant's hospital and in his care. The jury may well have considered and found that the curettement was performed by Dr. Boyd and the expulsion or delivery by the appellant. If appellant saw this unfortunate woman for the first time on May 7, 1947, as testified by him, in a state of distress, and he had not participated in any of the preliminaries, would it not have been more reasonable, certainly a safer course, to have called in her family and, perhaps, even another doctor through whose verity he might exonerate himself from any liability or responsibility for what occurred prior to the time she became his patient. Under all the facts here, the jury may have well believed from Dr. McClure's conduct in assisting with the expulsion of the packing and fetus that he had prior connection with the procurement of the abortion.

Most of the cases reported in this jurisdiction growing out of criminal abortion have been in cases where medicine or drugs have been administered or prescribed: *State* v. *Reed*, 45 Ark. 333; *Burris* v. *State*, 73 Ark. 453, 84 S. W. 723; *Davis* v. *State*, 96 Ark. 7, 130 S. W. 547; *Winfrey* v. *State*, 174 Ark. 729, 296 S. W. 82; *Clayton* v. *State*, 186 Ark. 713, 55 S. W. 2d 88; *Thompson* v. *State*, 163 Ark. 662, 260 S. W. 723.

In *Burris* v. *State, supra,* this court went to considerable length in treating of the word "administer," saying that the word as used in the statute does not signify merely the manual administering of the drug, medicine, or substance, but that it has a much wider meaning, and

recites further: "as used in said section, the word 'administer' was clearly intended to cover the whole ground named making it an offense to give, furnish, supply, provide with, or cause to be given, furnished, supplied, or provided with or taken any such drug, medicine or substance, with the intent named in said section. And said word embraced and was intended to embrace every mode of giving, furnishing, supplying, providing with, or causing to be taken, any such drug, medicine, or substance.' This is both the letter and spirit of the section. *McCaughey* v. *State*, 156 Ind. 41, 59 N. E. 169. *So say we*, the well known meaning of these words, as given by any of the standard lexicographers, shows that *the presence of the defendant in person at the time the medicine is delivered to or taken by the prosecutrix is not necessarily contemplated.*"

The statutes existing in many states, which permit an accessory before the fact to be charged as a principal instead of, as at common law, accessory before the fact, apply to the crime of abortion and it has been held that one who counseled and procured the commission of an abortion, though absent at the time the act was committed, may be charged in the indictment with the doing of the act and convicted on proof that he procured its commission. Am. Jur., Vol. I, § 8, p. 135, cites with approval the case of *People* v. *Blivin*, 112 N. Y. 79, 19 N. E. 638, 8 Am. St. Rep. 701, in an opinion by the Court of Appeals of New York: "That an indictment charging the defendant committed the act constituting an abortion will sustain a conviction on proof that he was absent at the time the crime was committed but aided, advised and procured its commission."

As previously stated, most of the cases involving violation of the abortion statute which have been under consideration in this jurisdiction resulted from the crude efforts of laymen attempting in their unskilled way to accomplish abortion by the prescribing or administering of drugs. This is not so in the case presently before us. Here, we have for consideration an appellant whose very training has been directed to the preservation of life rather than its destruction.

Upon a consideration of the entire case, we think the jury was warranted in its findings and verdict and the judgment is, therefore, affirmed.

It is so ordered.